IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Darcel W.,[1] | ) | C/A No.: 1:25-5971-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Frank Bisignano, Commissioner of | ) | RECOMMENDATION |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court
for a Report and Recommendation ("Report") pursuant to Local Civ. Rule
73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. §
405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying her claim for
Disability Insurance Benefits ("DIB") and Supplemental Security Income
("SSI"). The two issues before the court are whether the Commissioner's
findings of fact are supported by substantial evidence and whether he applied
the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be affirmed.

---

[1] The Committee on Court Administration and Case Management of the
Judicial Conference of the United States has recommended that, due to
significant privacy concerns in social security cases, federal courts should
refer to claimants only by their first names and last initials.

I.      Relevant Background

   A.      Procedural History

On June 17, 2021, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on May 17, 2021. Tr. at 350–52, 353–54, 361–82, 383–88. Her applications were denied initially and upon reconsideration. Tr. at 147–51, 152–56, 159–62, 163–66. On March 25, 2024, Plaintiff had a telephone hearing before Administrative Law Judge ("ALJ") James Martin. Tr. at 70–92 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 14, 2024, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 49–69. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 18, 2025. [ECF No. 1].

   B.      Plaintiff's Background and Medical History

      1.      Background

Plaintiff was 36 years old at the time of the hearing. Tr. at 62. She completed high school and training as a certified nursing assistant ("CNA"). Tr. at 82. Her past relevant work ("PRW") was as a CNA and a hotel housekeeper. Tr. at 89. She alleges she has been unable to work since May 17, 2021. Tr. at 54.

2.    Medical History

As a child, Plaintiff was diagnosed with attention deficit hyperactivity disorder ("ADHD") and a learning disorder. Tr. at 106. On October 15, 2020, an ultrasound showed a hyperemic and enlarged thyroid, possibly suggestive of thyroiditis. Tr. at 743–45. Prior to her alleged disability onset date, Plaintiff had "a longstanding history of uncontrolled Graves' hyperthyroidism" and "noncompliance with Methimazole, resulting in multiple [emergency room ("ER")] hospitalizations." Tr. at 551.

Plaintiff presented to the ER at St. Francis Downtown ("SFD"), with complaints of a non-productive cough, chills, shortness of breath, nausea, and vomiting on May 16, 2021. Tr. at 1152. Her pulse and blood pressure were elevated, and she was tachycardic. Tr. at 1154. She was discharged after receiving intravenous ("IV") fluids. Tr. at 1155.

Later that day, Plaintiff presented to the ER at Greenville Memorial Hospital ("GMH"), where she was diagnosed with a viral upper respiratory infection and discharged to the hospital lobby to wait for a bus. Tr. at 583, 607–14. Plaintiff spent the night in the lobby and requested to be seen again the following morning for worsening symptoms. Tr. at 583.

On May 17, 2021, Plaintiff was admitted to GMH for observation for suspected pneumonia, administered Methimazole 20 mg twice a day and a beta blocker, and prescribed Levaquin, Prednisone 10 mg twice a day, and

iodine drops. Tr. at 586, 589, 590. An ultrasound indicated an enlarged thyroid gland with heterogenous echotexture and hyperemia bilaterally that was similar to a prior study. Tr. at 1482. Sandra L. Weber, M.D. ("Dr. Weber"), noted that Plaintiff had not been taking Methimazole, despite multiple contacts with the hospital system and a filled Methimazole prescription. Tr. at 593. Although Plaintiff initially indicated a desire to proceed with surgery, she ultimately opted to delay it and restart treatment with Methimazole. Tr. at 594. Plaintiff's discharge diagnoses included Graves' disease, pneumonia, systemic inflammatory response, tachycardia, Graves' ophthalmopathy, psychosis, and acute combined systolic and diastolic congestive heart failure. Tr. at 601.

Plaintiff followed up with physician assistant ("PA") Katherine Hudgens ("Hudgens") on June 21, 2021. Tr. at 772–75. She reported improved cough and breathing and regular menstrual cycles and denied headaches, dizziness, chest pain, and palpitations. Tr. at 774. PA Hudgens recorded normal observations on physical exam, aside from exophthalmos and thyromegaly. Tr. at 774–75. She assessed improved hyperthyroidism and refilled Methimazole, Propranolol, and Lisinopril. Tr. at 775.

Plaintiff presented to endocrinologist Mojgan Rahmani, M.D. ("Dr. Rahmani"), for evaluation of Graves' hyperthyroidism on July 1, 2021. Tr. at 570. Dr. Rahmani noted Plaintiff had been prescribed Methimazole 40 mg

during her last ER admission, and Plaintiff indicated she had been compliant with taking the medication. *Id.* She counseled Plaintiff on treatment options that included medical therapy, radioactive treatment, and surgery, and Plaintiff indicated she would consider the options and call the office with a decision. *Id.* Dr. Rahmani recorded no abnormalities on physical exam. Tr. at 569. She continued Plaintiff's medications. Tr. at 573.

Plaintiff followed up with Ann Johns, M.D. ("Dr. Johns"), for eye irritation on July 15, 2021. Tr. at 766–71. Her blood pressure was elevated, but she admitted she had eaten a lot of salt. Tr. at 769. Dr. Johns noted conjunctival irritation and redness to the right eye and significant bilateral exophthalmos. Tr. at 770. She assessed bacterial conjunctivitis, exophthalmos due to thyroid eye disease, hypertensive disorder, and overweight body mass index ("BMI"). *Id.* She noted Plaintiff was homeless and educated her on tobacco use cessation, decreasing alcohol use and salt intake, compliance with blood pressure medications, and daily exercise. *Id.*

On August 20, 2021, Dr. Rahmani attempted to confirm that Plaintiff had been taking Methimazole and her beta-blocker, as she had been prescribed high-dose Methimazole, and her thyroid function test remained consistent with hyperthyroidism. Tr. at 561. She discussed options for surgery and radioactive iodine treatment, but Plaintiff was reluctant to consider those options, and Dr. Rahmani noted there was a "question of

5

compliance with her treatment." *Id.* Dr. Rahmani noted slight proptosis of the eyes, enlarged thyroid, and irritability on exam. Tr. at 564.

Plaintiff also visited PA Hudgens on August 20, 2021. Tr. at 760. She complained of nausea, weight gain, urinary frequency, and a missed period. Tr. at 760. PA Hudgens noted an eight-pound weight gain, exophthalmos, and thyromegaly. Tr. at 763–64. She assessed stable anemia, increased urinary frequency, hyperthyroidism, missed period with negative pregnancy test, nausea, hypertension, and overweight BMI. Tr. at 764. She prescribed Zofran for nausea and continued Lisinopril and Propranolol for hypertension. *Id.* She noted that Plaintiff may need Methimazole decreased, given her symptoms. *Id.*

On August 24, 2021, Dr. Rahmani informed Plaintiff that the pregnancy tests from earlier in the week were negative. Tr. at 1771. She attempted to confirm that Plaintiff was taking Methimazole and informed her that, assuming she was taking the medication as prescribed, "even high dose of methimazole [was] not controlling her hyperthyroidism" and "more definite options need[ed] to be considered." *Id.* Plaintiff was reluctant to pursue additional treatment, and Dr. Rahmani referred her back to her primary care physician to obtain a second opinion. *Id.*

Plaintiff presented to the ER at GMH for nausea, vomiting, and weight gain on August 31, 2021. Tr. at 555–59. A physical exam was normal, aside

from elevated blood pressure of 151/98 mmHg and mild obesity. Tr. at 556. A urine pregnancy test was negative. Tr. at 557. Plaintiff was diagnosed with a prolonged menstrual cycle and nausea and was discharged to follow up with a gynecologist. Tr. at 557–58.

Plaintiff presented to gynecologist Kelly Little, M.D. ("Dr. Little"), for a routine gynecologic exam on September 22, 2021. Tr. at 551–54. She reported irregular bleeding and abdominal weight gain and thought she was likely pregnant, despite multiple negative pregnancy tests. Tr. at 551. She indicated she had discontinued her medications based on her impression that she was pregnant. *Id.* Dr. Little ordered a urine pregnancy test that was negative. Tr. at 553. She encouraged Plaintiff to restart her medications and to use contraceptives. Tr. at 553–54.

Plaintiff presented to the ER at SFH on October 25, 2021, after being hit in the head. Tr. at 1148–52. She reported worsening headache throughout the day. Tr. at 1148. Her pulse was elevated, and she had a mild contusion to the left parietal scalp with mild-to-moderate tenderness. Tr. at 1150–51. A computed tomography ("CT") scan of the head showed no acute hemorrhage and no acute cranial abnormality. Tr. at 1151. A CT scan of the spine showed no acute fracture, normal cervical spine alignment, intact cranio-cervical junction, aligned lateral masses, preserved vertebral body heights, and enlarged thyroid. *Id.* A chest x-ray was unremarkable. *Id.*

Plaintiff followed up with Dr. Little for a breast exam and pap smear on October 28, 2021. Tr. at 1738. She reported having resumed use of Methimazole, Propranolol, and Lisinopril following her prior visit, but admitted she had not followed up with endocrinology. *Id.* Dr. Little encouraged Plaintiff to remain complaint with Methimazole and to follow up with an endocrinologist. Tr. at 1739. She discussed contraceptive options with Plaintiff and Plaintiff indicated she desired to proceed with insertion of Nexplanon. *Id.*

Plaintiff presented to the ER at GMH on October 30, 2021. Tr. at 838. She reported chest pain, dyspnea, lightheadedness with ambulation, blurry vision, and unclear memory after being hit on her head on October 25. *Id.* She indicated she had been taking Propranolol and Methimazole, although she had not taken them over the prior three days. *Id.* Plaintiff's thyroid-stimulating hormone ("TSH") level was undetectably low, and Plaintiff later admitted she had not taken her thyroid medication recently. Tr. at 862. A physical exam was unremarkable, aside from tachycardia. Tr. at 840–41. Cardiac testing showed mild left ventricular systolic dysfunction with ejection fraction of 45%, left ventricular diastolic dysfunction, B-type natriuretic peptide ("BNP") of 560, and mild jugular vein distention. Tr. at 844. William Paul Johnson, M.D. ("Dr. Johnson"), diagnosed thyrotoxicosis and non-cardiac chest pain and discharged Plaintiff the following day with

8

prescriptions for Methimazole 20 mg twice a day, Propranolol 20 mg twice a day, Lisinopril 10 mg daily, and Prednisone 10 mg daily. Tr. at 861, 863.

Plaintiff presented to the ER at SFD for a sore throat, body aches, vomiting, and diarrhea on January 24, 2022. Tr. at 1145. She was tachycardic and had an elevated pulse and blood pressure. Tr. at 1147. Her condition improved after she received IV fluids, and she was discharged from the ER the following morning. Tr. at 1148.

Plaintiff followed up with PA Hudgens on February 23, 2022. Tr. at 754–59. She reported mild nosebleeds over the prior couple of weeks that she thought were likely caused by the weather and the way she was sleeping. Tr. at 758. She said she was only taking one tablet of her thyroid medication daily. Tr. at 754. PA Hudges noted Plaintiff's hypertension was stable and continued Lisinopril and Propranolol. Tr. at 758. She instructed Plaintiff to follow up with the endocrinologist for hyperthyroidism. *Id.*

Plaintiff was treated in the ER at SFD for infectious gastroenteritis and colitis on March 31, 2022. Tr. at 1142–45.

On April 22, 2022, a chest x-ray showed stable mild cardiomegaly and no evidence of acute intrathoracic processes. Tr. at 1273.

Plaintiff presented to the ER at SFD with complaints of fever, body aches, cough, nausea, late periods, chills, congestion, sneezing, and sore

throat on June 24, 2022. Tr. at 1138–42. A chest x-ray was negative, and Plaintiff was diagnosed with a viral illness. Tr. at 1139.

Plaintiff presented to the ER at GMH for vomiting, nausea, and diarrhea on June 27, 2022, but left against medical advice before being examined. Tr. at 1660.

Plaintiff was treated in the ER at SFD for COVID-19 on July 14, 2022. Tr. at 1134–38. Her symptoms improved after she received a liter of IV fluids. Tr. at 1135. The ER provider instructed her to continue taking Tylenol and prescribed Zofran for nausea. Tr. at 1135.

Plaintiff presented to the ER at SFD on November 2, 2022, with complaints of neck pain, arthralgias, and bilateral upper extremity bruising due to a physical assault. Tr. at 1128–33. X-rays of her cervical spine showed no acute fracture or significant degenerative changes. Tr. at 1132. The ER provider discharge Plaintiff the same day and encouraged rest, ice, and ibuprofen or Tylenol. Tr. at 1129.

Plaintiff visited the ER at GMH complaining of chest and neck pain and increased phlegm on November 4, 2022. Tr. at 814–34, 948–50. Her blood pressure was elevated at 158/90 mmHg and she was tachycardic, but the exam was otherwise normal. Tr. at 816, 819. A CT scan of Plaintiff's neck and chest was concerning, as Plaintiff appeared to have upper lobe pneumonia, and the picture was "quite concerning for [tuberculosis]." Tr. at 819. Plaintiff

endorsed compliance with her medications, but a medication dispense report showed her medications had not been filled. Tr. at 830. She was discharged on November 6, 2022, with prescriptions for Methimazole 10 mg twice daily, Propranolol 10 mg daily, and Lisinopril 10 mg daily, given prescription vouchers, and scheduled for follow up visits with her primary care physician and an endocrinologist. Tr. at 830, 831. Tuberculosis was ruled out and Plaintiff's cough, hemoglobin, hemoptysis, and oxygen saturation improved during her hospitalization. Tr. at 830.

Plaintiff presented to the ER at GMH on February 13, 2023, complaining of knee and neck pain after falling at work. Tr. at 807–14, 937–42, 1586–1601. She indicated she had taken most of her medications "off and on" and had not recently taken her thyroid medication, as she had "felt good" and preferred to treat her hyperthyroidism with diet. Tr. at 809. Plaintiff's blood pressure was elevated at 152/84 mmHg. Tr. at 810. She appeared mildly distressed, had diffuse tenderness to palpation of the neck, shoulders, and thoracic spine, was tender to palpation of the proximal left knee joint, had limited range of motion of her neck, arms, and legs, and had 5/5 strength in her upper and lower extremities. Tr. at 811. X-rays of Plaintiff's cervical, thoracic, and lumbar spine showed no signs of traumatic injury. *Id.* Nicholas Hyatt Russell, M.D., Ph.D. ("Dr. Russell"), discharged Plaintiff with

instruction to treat her pain with Tylenol, as Plaintiff refused a muscle relaxant. *Id.*

Plaintiff presented to the ER at SFD after a fall on May 28, 2023. Tr at 1124–28. X-rays of Plaintiff's left hip, shoulder, and knee showed no acute findings. Tr. at 1126–27. A fall, contusions of the left knee and hip, left shoulder sprain, and acute cervical myofascial strain were assessed, and Plaintiff was discharged the same day with prescriptions for ibuprofen 800 mg and Zanaflex 4 mg. Tr. at 1124, 1126.

On June 2, 2023, Plaintiff visited the ER at SFD after being injured in a car accident. Tr. at 1116–24. X-rays were unremarkable. Tr. at 1117. She was assessed with neck and lumbar strains and discharged the same day. Tr. at 1116.

Plaintiff returned to the ER at SFD on June 8, 2023, with light bleeding and concern for possible pregnancy. Tr. at 1112–16. A physical exam was normal. Tr. at 1113–14. A pregnancy test was negative. Tr. at 1115. Plaintiff was discharged from the ER with no prescriptions. Tr. at 1115–16.

Plaintiff presented to Jessica Himmelstein, M.D. ("Dr. Himmelstein"), for hospital follow-up on June 12, 2023. Tr. at 1992–96. Dr. Himmelstein encouraged healthy diet and exercise to address obesity. Tr. at 1996.

On June 23, 2023, Plaintiff underwent a pelvic ultrasound that showed a left ovarian cyst. Tr. at 1384–85.

Plaintiff returned to Dr. Himmelstein on July 25, 2023. Tr. at 1986–91. She expressed no concerns. Tr. at 1986. She indicated she had picked up Methimazole and Propranolol and had been taking them daily for two to three weeks. Tr. at 1989. She indicated she was feeling much better, but denied having scheduled an appointment with an endocrinologist. *Id.* Dr. Himmelstein refilled Methimazole and Propranolol and encouraged Plaintiff to follow up with an endocrinologist. Tr. at 1990.

Plaintiff reported to the ER at GMH with complaints of worsening neck and back pain and difficulty ambulating on August 25, 2023. Tr. at 1572–79. A physical exam was normal, aside from elevated heart rate and blood pressure. Tr. at 1576. PA Amelia Crowley administered trigger-point injections along Plaintiff's bilateral upper back and trapezius and her left lumbar paraspinal region. Tr. at 1937–38. Stephen Strasburg, M.D., discharged Plaintiff with prescriptions for ibuprofen 800 mg and Lidocaine patches. Tr. at 1577.

On September 8, 2023, Plaintiff reported to the ER at GHM with mild left-sided back pain, neck pain, and arthralgias following a car accident. Tr. at 1559–66. The treating provider assessed a back strain and discharged Plaintiff later that day with prescriptions for Lidoderm patches and ibuprofen 800 mg. Tr. at 1562–63.

13

Plaintiff presented to William Hendry, a Doctor of Acupuncture and Oriental Medicine, on October 3, 2023. Tr. at 1967–68. It was her fourth visit for electroacupuncture treatment, as she had previously been seen and undergone the procedures on September 11, 18, and 25. Tr. at 1967. She reported some abatement of her pain, but additional treatment was recommended. *Id.*

Plaintiff followed up with Dr. Himmelstein on October 5, 2023. Tr. at 1980–85. She complained of back pain since the car accident in September and left leg pain and numbness since the fall in May. Tr. at 1980. Dr. Himmelstein noted Plaintiff had no midline tenderness and all her tenderness was in the left paralumbar muscles. Tr. at 1983. Plaintiff had limited flexion, but normal extension, lateral flexion, and rotation and no pain with motion. Tr. at 1984. She gave Plaintiff a Lidoderm patch, told her to continue to use ibuprofen 800 mg, and prescribed a contraceptive patch. Tr. at 1983.

Plaintiff returned to Dr. Himmelstein on November 3, 2023. Tr. at 1974–79. She complained of left leg and ankle and back pain since the September car accident. Tr. at 1974. She also indicated her pain may be related to a fall at a hotel in May 2023. *Id.* Dr. Himmelstein noted normal movement of all extremities and no tenderness, cyanosis, or edema. Tr. at

1978. She prescribed a seven-day trial of Cyclobenzaprine and Naproxen and referred Plaintiff to physical therapy. *Id.*

On November 15, 2023, Plaintiff requested Dr. Himmelstein complete paperwork. Tr. at 1969. Dr. Himmelstein informed Plaintiff that she was unable to complete a form indicating Plaintiff was disabled and unable to work. Tr. at 1972. She recorded normal findings on physical exam, aside from noting Plaintiff was overweight and demonstrated exophthalmos. Tr. at 1973. She reviewed lab studies that showed Plaintiff's TSH remained out of range and increased Methimazole to 20 mg three times a day. *Id.*

Plaintiff visited the ER with complaints of cough, nasal congestion, fever, rhinorrhea, headache, sore throat, vomiting, chest pain, dyspnea, chills, diaphoresis, shortness of breath, nausea, and myalgias on November 28, 2023. Tr. at 2028–32. She was diagnosed with influenza B. *Id.*

Plaintiff returned to the ER the following day and was found to be mildly dehydrated. Tr. at 2024–27. Her symptoms improved after she received IV fluids, Zofran, and ibuprofen. Tr. at 2025.

Plaintiff followed up with Dr. Himmelstein on December 20, 2023. Tr. at 2009–15. She requested Dr. Himmelstein complete paperwork. Tr. at 2009. Dr. Himmelstein noted recent labs showed leukopenia. Tr. at 2014. She instructed Plaintiff to stop Methimazole and to reduce Propranolol to 20 mg twice a day, pending complete blood count testing after January 1, 2024. *Id.*

15

She referred Plaintiff to a cardiologist and an ophthalmologist. *Id.* She partially completed a form stating she was Plaintiff's primary care physician and indicating the dates she had treated Plaintiff, but noted she did not check any boxes listing Plaintiff as disabled, as she was "not her disability provider." *Id.*

Plaintiff presented for a mental health assessment on January 3, 2024. Tr. at 2002–08. She reported stress, inability to sleep, depression, and wandering and racing thoughts. Tr. at 2002. She endorsed a history of physical abuse from her ex-husband and a boyfriend and sexual abuse as a child. Tr. at 2005. The clinician recorded normal findings on mental status exam ("MSE"), as Plaintiff had normal appearance, motor activity, and eye contact, cooperative attitude, calm behavior, appropriate affect, euthymic mood, normal rate and tone of speech, and logical/goal-directed thought processes. Tr. at 2006. Plaintiff denied suicidal thoughts and ideations. *Id.* She had difficulty remembering important facts, poor decision-making adversely affecting herself and others, as her children were in foster care, limited insight, and average fund of knowledge. *Id.* She endorsed fatigue and insomnia with adequate appetite/eating patterns and sex drive/libido. Tr. at 2007. The clinician's diagnostic impressions were moderate, recurrent major depressive disorder, posttraumatic stress disorder, homelessness, and relationship distress with spouse or intimate partner. Tr. at 2008. She

recommended Plaintiff attend individual therapy sessions twice a month. Tr. at 2009.

On February 14, 2024, Plaintiff presented to Hunter Lee Honeycutt, M.D. ("Dr. Honeycutt"), for a cardiac exam. Tr. at 2020–23. Dr. Honeycutt noted Plaintiff's ejection fraction had increased from 45–50% in 2021 to 50–54% in November 2022, although she had global hypokinesis at that time. Tr. at 2020. Plaintiff endorsed shortness of breath on exertion once or twice a week. *Id.* Dr. Honeycutt noted Plaintiff was doing well from a cardiac standpoint. Tr. at 2021.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing, Plaintiff testified she had been diagnosed with congestive heart failure, overactive thyroid, and high blood pressure. Tr. at 77. She said that when she had worked, she had been able to maintain a job for one to two months, but not longer than a year at a time due to health problems. *Id.* She admitted she had returned to work after filing her application, but had stopped working after sustaining a concussion when a man struck her in the head. *Id.* She said had returned to work a second time, but had lost that job after being hospitalized in 2023. Tr. at 78.

Plaintiff stated she was unable to work between May 2021 and May 2022 because she was in and out of the hospital, unable to walk, and losing her balance. *Id.* She said she was fired from her job in May 2021 because she was using the bathroom excessively and being hospitalized due to congestive heart failure. Tr. at 79.

Plaintiff clarified that she had initially returned to work from around May to September or October 2022 and had stopped working when she contracted COVID-19, was struck in the head, and required hospitalization. Tr. at 79–80.

Plaintiff estimated she could walk for less than a quarter of a mile before developing shortness of breath. Tr at 80. She said her conditions were stable due to her not working. *Id.*

Plaintiff endorsed some difficulties cooking, cleaning, performing household chores, and dressing. Tr. at 81. She stated she had been injured in a bus accident in June 2023. *Id.* She said she had difficulty walking and required three or four pain medications and injections to her spine. Tr. at 81–82.

Plaintiff testified she had completed high school, had been trained as a customer service representative and in marketing and management, and had obtained certification as a CNA. *Id.* She said she had pursued a degree in healthcare administration and had worked as a specialization accountant. *Id.*

18

She stated she had not obtained her degree because she had been injured in a car accident in March 2013. *Id.* She indicated she pursued further training in acting in Los Angeles in 2017. Tr. at 83.

Plaintiff confirmed that she had a driver's license, but said she had not driven over the prior couple of years due to trauma and use of medications that made her feel sleepy. *Id.* She said she was currently living with family. *Id.*

Plaintiff admitted she had previously worked as a CNA at Westside Living Center. Tr. at 83–84. She confirmed she had worked for PHG as a housekeeper in a hotel in 2022. Tr. at 84. She indicated she worked at several places for short periods in 2023. Tr. at 85.

Plaintiff testified that she enjoyed and continued to engage in swimming. Tr. at 85–86. She said she walked daily for as long has she could push herself before getting on the city bus. Tr. at 86. She indicated she enjoyed exercise, but could not exercise if she was "wearing out." *Id.* She indicated her hobbies included writing and watching movies. *Id.*

Plaintiff stated she had two daughters, ages seven and nine. *Id.* She said her mother and sister helped her with her daughters and provided support for about 25% of their activities. *Id.* She indicated she helped to care for two cats. Tr. at 87.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Elizabeth Shultz reviewed the record and testified at the hearing. Tr. at 87–91. The VE categorized Plaintiff's PRW as a nurse assistant, *Dictionary of Occupational Titles* ("*DOT*") No. 355.674-014, as requiring medium exertion and a specific vocational preparation ("SVP") of 4, and a housekeeping cleaner, *DOT* No. 323.687-014, as requiring light exertion and an SVP of 2. Tr. at 89. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could: perform less than a full range of medium work requiring lifting and/or carrying 50 pounds occasionally and 25 pounds frequently, sitting for six hours in an eight-hour day, standing and/or walking for six hours in an eight-hour day, and pushing and pulling as much as she could lift or carry; occasionally climb ladders, ropes, or scaffolds; occasionally work in an environment with unprotected heights; frequently work in an environment with dust, odors, fumes, and irritants, as well as extreme cold; occasionally work in an environment with extreme heat; sustain concentration, persistence, and pace to carry out simple instructions in two-hour increments with no specific production rate, such as assembly line work or work that requires hourly quotas; and tolerate occasional changes in routine work setting. Tr. at 89–90. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 90. The ALJ asked whether there were any other jobs in the economy

that the hypothetical person could perform. *Id.* The VE identified a job at the medium exertional level with an SVP of 1 as a house cleaner II, *DOT* No. 919.687-014, with approximately 143,000 positions in the national economy, as well as jobs at the medium exertional level with an SVP of 2 as a laundry laborer, *DOT* No. 361.687-018, and a floor waxer, *DOT* No. 381.687-034, with 21,000 and 46,000 positions in the national economy, respectively. *Id.* The ALJ asked the VE if her testimony had been consistent with the *DOT*, and the VE confirmed that it had. Tr. at 91.

The ALJ next asked the VE to consider that the hypothetical individual would be absent from work two days per month. *Id.* The ALJ asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE testified the individual would be unable to perform Plaintiff's PRW or any other jobs, as the number of absences would exceed employer tolerances. *Id.* She clarified that her testimony as to absenteeism had been based on her education, experience, and training, as the *DOT* did not address absenteeism. *Id.*

2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2027.
2.    The claimant has not engaged in substantial gainful activity since May 17, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Congestive Heart Failure; Major Depressive Disorder; and Post-Traumatic Stress Disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    …

    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can lift and or carry 50 pounds occasionally and 25 pounds frequently; she can stand and or walk for 6 hours of an 8-hour workday; she is able to sit for 6-hours of an 8-hour workday; she is able to push and pull as much as she can lift and carry; the claimant can occasionally climb ladders, ropes, or scaffolds; she can occasionally work in an environment with unprotected heights, frequently be in an environment with dust, odors, fumes and pulmonary irritants, frequently in an environment in extreme cold, and occasionally in an environment in extreme heat; she is able to sustain concentration, persistence, and pace sufficient to carry out simple instructions in two-hour increments with no specific production rate, such as assembly line work, or work that requires hourly quotas; and she is able to tolerate few changes in a routine work setting defined as occasional changes in a routine work setting.

5.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6.  The claimant was born on July 31, 1987 and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

7.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, from May 17, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 54–63.

## II.   Discussion

Plaintiff alleges the Commissioner erred because the ALJ did not provide adequate reasons for his evaluation of her subjective complaints.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that

she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ failed to provide adequate and specific reasons for rejecting some of her subjective complaints. [ECF No. 8 at 16–20]. She claims the ALJ failed to reconcile positive and negative findings to support his conclusion. *Id.* at 17. She notes that the record contains no medical opinion from a treating or examining medical provider and that the ALJ should have ordered a consultative examination. *Id.* She asserts the ALJ erroneously searched for objective evidence to support her allegations of pain. *Id.* at 18.

The Commissioner argues the ALJ properly evaluated Plaintiff's subjective complaints. [ECF No. 11 at 6]. He references Plaintiff's work and income following her alleged disability onset date. *Id.* at 7. He maintains the ALJ properly considered all the evidence in evaluating Plaintiff's subjective complaints and accommodated the credibly-established complaints in the residual functional capacity ("RFC") assessment. *Id.* at 7–8.

27

Plaintiff counters that the ALJ did not explain how her work activity after her alleged disability onset date supported his evaluation of her subjective complaints and notes the ALJ found she could no longer perform this type of work. [ECF No. 12 at 1–2]. She maintains the ALJ's summary of the evidence does not support his conclusion that her allegations were not entirely credible. *Id.* at 2–3.

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes at the first step that the claimant's impairment could reasonably produce the symptoms she alleges, he proceeds to the second step, which requires him to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

An ALJ "improperly increase[s]" the claimant's "burden of proof" where he requires the subjective description of symptoms to be verified by objective medical evidence. *Lewis*, 858 F.3d at 866. Thus, if an ALJ concludes a claimant has severe impairments that could reasonably cause the symptoms

28

she alleges, the ALJ cannot reject the functional limitations the claimant states simply because there are not enough clinical signs and laboratory findings to corroborate the allegations. *See Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 95–96 (4th Cir. 2020); *Oakes v. Kijakazi*, 70 F.4th 207, 216–17 (4th Cir. 2023).

Nevertheless, the ALJ must consider at the second step "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). In undertaking this inquiry, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well as the following factors, where applicable: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain

or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6.

The ALJ must explain which of the claimant's alleged symptoms he considered "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions. SSR 16-3p, 2017 WL 5180304, at *8. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10.

> After summarizing Plaintiff's allegations, the ALJ wrote:
>
> Considering the objective findings, the treatment received, and the symptomatic complaints in the record, I find the claimant retains the residual functional capacity for a range of medium work as noted above. Although the claimant alleged she is unable to work due to her congestive heart failure, overactive thyroid, and high blood pressure, the longitudinal medical record does not support such allegations.

Tr. at 58.

The ALJ concluded Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. at 59. He proceeded to summarize the

30

record as to Plaintiff's treatment for congestive heart failure, overactive thyroid, and high blood pressure. *Id.* In accordance with, 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4), he subsequently explained why Plaintiff's allegations were inconsistent with the other evidence in the record.

While Plaintiff alleges the ALJ merely summarized the record without explaining how the evidence supported his failure to credit all her subjective statements, the record reflects the ALJ first recited Plaintiff's treatment for acute problems and then summarized additional evidence, explaining that her allegations were refuted by records showing improvement of her impairments and symptoms over the relevant period. The ALJ summarized Plaintiff's May 2021 hospitalization records, noting that she had combined systolic and diastolic dysfunction with left ventricular ejection fraction between 45% and 50%. Tr. at 59 (citing Tr. at 1610). He acknowledged that Plaintiff had been treated for shortness of breath and tachycardia in November 2022 and pointed out improvement in the diagnostic findings, as an echocardiogram showed "low normal left ventricular systolic function, normal left ventricular diastolic function, mildly dilated left ventricle, mild aortic valve regurgitation, and mild hypertension." *Id.* (citing Tr. at 1609).

The ALJ did not rely exclusively on the objective evidence, but also on Plaintiff's statements to her medical providers regarding her symptoms and her medical providers' impressions regarding her impairments. He referenced

Plaintiff's November 2022 report of "no headaches, vision changes, weakness, slurred speech, syncope, chest pain, nausea, vomiting, constipation, lower extremity pain, or lower extremity edema." Tr. at 58 (referencing Tr. at 1609). He noted that Dr. Himmelstein declined to complete a form stating Plaintiff was disabled and unable to work. *Id.* (citing Tr. at 1973, 2013). He pointed out that during the same visit, Plaintiff denied chest pain, shortness of breath, palpitations, and fatigue. *Id.* (citing Tr. at 1973). He indicated that on December 20, 2023, Dr. Himmelstein noted Plaintiff had "no symptoms of heart failure and no lower extremity edema." *Id.* (referencing Tr. at 2014). He cited Dr. Honeycutt's January 2024 impressions that Plaintiff had "recovered" and "was doing well from a cardiac standpoint." Tr. at 59 (citing Tr. at 2021). He referred to Plaintiff's testimony that she "loves to exercise," "tries to walk daily and swim," and that her health had stabilized. Tr. at 59, 60 (citing H'rg Tr.)

Although the ALJ noted inconsistencies in Plaintiff's reports as to shortness of breath, he specified that he credited her allegation insomuch as he included environmental restrictions in the RFC assessment. *See* Tr. at 57, 59.

While the ALJ acknowledged evidence as to mental impairments, he noted Plaintiff had required no medication, formal mental health treatment, or psychiatric care. Tr. at 60. He summarized a January 2024 mental health

assessment and explained that the findings on mental status exam and Plaintiff's reports to the provider supported a finding that Plaintiff was "able to maintain adequate pace to perform simple, routine tasks as consistent with no limitations in understanding, remembering and applying information"; could meet "no specific production rate, as consistent with moderate limitations in concentration, persistence, and pace"; and function "with only occasional changes in workplace settings, as consistent with moderate limitations in adapting and managing oneself." *Id.* The ALJ stated he had accommodated Plaintiff's alleged difficulty with concentration and understanding by finding she was "able to sustain concentration, persistence, and pace sufficiently to carry out simple instructions in two-hour increments." *Id.* He explained that greater limitations were not warranted, given Plaintiff's representations that she could follow written and spoken instructions well, her ability to attend to and answer questions during the hearing, and notes in the record that she "can maintain attention and concentration, short- and long-term memory are also appropriate." *Id.* He found that Plaintiff's alleged limitations in her ability to manage herself limited her "to work with no specific production rate, such as assembly line work, or work that requires hourly quotas" allowed her "to tolerate few changes in a routine work setting[,] defined as occasional changes in a routine work setting." *Id.* To support this conclusion, the ALJ referenced

Plaintiff's indication on a function report that she did not need special reminders to take care of personal needs and grooming, served as primary caretaker for her two children, could drive as necessary, and could shop and manage finances. *Id.* He also cited Plaintiff's providers descriptions of her appearance, grooming, and hygiene during visits. *Id.*

In addition to the reasons cited above, the ALJ found that no greater limitations were warranted based on Plaintiff's "quarterly earnings for all 4 quarters in 2022" and her report in January 2024 that "she was looking for work." Tr. at 60. Thus, the ALJ relied on Plaintiff's ability to perform some work and to look for additional work to support his overarching conclusion that Plaintiff's impairments improved over time and were not as disabling as she alleged.

The undersigned finds unavailing Plaintiff's argument that the ALJ erred in declining to obtain a consultative exam or other medical opinion. The regulations provide specific instructions for the evaluation of medical opinions when they appear in the record, *see* 20 § C.F.R. 404.1520c and §416.920c, but medical opinions, where present, are among several types of evidence the ALJ must consider in evaluating a claimant's allegations as to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *6. Ultimately, the ALJ is responsible for assessing a

claimant's symptoms and determining her RFC based on the entire record before him. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a), 404.1546(c), 416.946(c).

The burden to produce evidence of disability generally lies with the claimant. *See Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). However, if the evidence is insufficient, the ALJ has a duty to further develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating the ALJ has "a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate") (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). Evidence is insufficient "when it does not contain all the information [the ALJ] need[s] to make [a] . . . decision." 20 C.F.R. §§ 404.1520b(b), 416.920b(b). If the evidence is insufficient, the ALJ is to determine the best way to resolve the issue, which may require him to: (i) recontact[] the claimant's medical source; (ii) request[] additional evidence; (iii) refer[] the claimant for a consultative examination; or (iv) ask[] the claimant for more information. 20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2). "While the ALJ must make a reasonable inquiry into a claim of disability, he

has no duty 'to go to inordinate lengths to develop a claimant's case.'" *Craft v. Apfel*, 164 F.2d 624, 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision) (citing *Thomas v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977).

The court described the appropriate inquiry in *Hammond v. Astrue*, C/A No. 3:11-871, 2012 WL 4118277, at *9 (S.D.W. Va. Sept. 19, 2012), explaining:

> When considering whether the record before an ALJ was adequate, a reviewing court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant, and remand is warranted only when the absence of available documentation creates a likelihood of prejudice. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995). The burden to establish disability rests with the claimant. Thus, to successfully demonstrate that the ALJ relied on an insufficient record, the claimant must "indicate what evidence the ALJ failed to seek," *Rose v. Commissioner of Social Security*, No. 98-2169, 1999 WL 147618, at *2 (4th Cir. Mar. 18, 1999) (unpublished), and "how [the evidence] would have impacted the ALJ's assessment." *Bell* [*v. Chater*, 57 F.3d 1065 (Table), 1995 WL 347142 (4th Cir. 1995)]. Simply stated, the claimant is required to make a showing of how he or she was prejudiced by the ALJ's alleged failure to fully develop the evidence. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

Plaintiff has pointed to no symptom or impairment that required further examination. A review of the record before the ALJ suggests it was reasonably sufficient to permit him to assess Plaintiff's subjective allegations and RFC. There are no obvious evidentiary gaps, and Plaintiff has not shown how she was prejudiced by the ALJ's failure to obtain a consultative exam.

36

Between June and December 2023, Plaintiff received monthly treatment from Dr. Himmelstein, who declined to opine as to any functional limitations. Thus, it is not reasonable to expect a one-time consultative exam would yield valuable information needed to assess Plaintiff's ability to perform work activity. In addition, the undersigned's review of the record reveals no request for a consultative exam prior to or following the hearing, such that the ALJ would have been on notice that Plaintiff perceived an evidentiary gap.

Given the foregoing, the undersigned recommends the court find the ALJ did not err in declining to obtain a consultative exam or other medical opinion. The undersigned further recommends the court find the ALJ complied with the applicable regulations, SSR 16-3p, and Fourth Circuit precedent in evaluating and explaining his consideration of Plaintiff's subjective allegations and accommodating the credibly-established limitations in the RFC assessment.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 15, 2025                         Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).